### GENERAL ELECTRIC CO. v. RE-NEW LAMP CO. et al.

(Circuit Court, D. Massachusetts. February 25, 1903.)

#### No. 1,664.

1. TRADE-MARKS—INFRINGEMENT—RECONSTRUCTED ARTICLES.

Defendant was engaged in the business of buying burned-out electric lamps—among others, lamps made by complainant, and bearing its trademark—cleaning and repairing them, and inserting new filaments, after which they were resold. *Held*, that such process was a reconstruction, and not merely a repairing, and defendant's lamps were a different product from those of complainant, and not entitled to be resold under its trade-mark.

2. SAME—RIGHT TO INJUNCTION—MANNER OF AFFIXING TRADE-MARK.

Complainant was a large manufacturer of electric lamps, and defendant had established quite a large and important business in renewing or remaking burned-out lamps bought from the public and reselling the same. It conducted its business in a fair and legitimate manner, removing the old labels from the lamps, and affixing its own labels to the reconstructed lamps. After it had been in business some two years, complainant began affixing its trade-mark "G. E." to each of its lamps, pasting the same in the interior of the leading-in tube in the process of manufacture, bringing it also within the bulb, and where defendant could not remove it, at least without increasing the cost of remaking the lamp, and it sold lamps of complainant's make after it had reconstructed the same with such trade-mark remaining therein, affixing its own labels on the outside. *Held*, in a suit to enjoin such sales as an infringement of complainant's trade-mark, that, in the absence of clear proof that

complainant placed its trade-mark where it did for legitimate trade-mark purposes, to identify its goods, and not with the ulterior purpose of preventing legitimate competition by the remaking and reselling of the lamps after they had been burned out, a court of equity would not grant a preliminary injunction, but would leave the rights of the parties to be determined on a full hearing.

In Equity.  Suit for infringement of trade-mark.  On motion for preliminary injunction.

William K. Richardson, for complainant.
Jesse C. Ivy, for defendants.

BROWN, District Judge.  The General Electric Company has acquired a title to the trade-mark "G. E.," which is applied to electric goods of various kinds.  It appears in the complainant's affidavits that its lamps have gradually become known as "General Electric" or "G. E.," as well as "Edison" lamps; and that all these terms to-day denote exclusively lamps of the General Electric Company's manufacture.  It does not appear that the mark "G. E." had been used during the life of the Edison lamp patent as a generic name of the patented article in such manner as to authorize its use by the defendants as a common name of a lamp made according to the directions of the Edison patent.  Complainant's counsel state that this patent expired in 1894, though, by its terms, it was to expire in 1897. In June, 1900, the General Electric Company began to affix labels bearing the trade-mark "G. E." to barrels and packages of lamps. Beginning in October, 1900, the letters "G. E." were affixed to each and every incandescent lamp, with the exception of lamps of odd and special shapes and designs.  Some 24,000,000 lamps have been put out bearing the "G. E." trade-mark since October, 1900.  There can be no reasonable doubt that the letters "G. E." might constitute a valid trade-mark.

The Re-New Lamp Company is a corporation organized in 1898, and since then engaged in the bus'ness of receiving and buying from the public burned-out electric lamps, including lamps of the complainant, and remaking or reconstructing them in substantially the following manner:

"The tip of the bulb is removed, and then the hole is enlarged, and the edge smoothed.  The old burned-out filament is then removed, and the glass is cleaned.  A new filament is then inserted, and its two ends are fastened to the leading-in wires (and generally its middle is anchored to the anchor wire) by means of carbon paste.  The lamp is next inspected for defects. A glass tube is then welded to the opening in the top.  The lamp is then exhausted by the aid of a pump, and the top of the lamp is then sealed."

While the grounds for a distinction between reconstruction and repair would probably differ in a case relating to a patented article embodying an inventive conception and in a case relating to the same article after the expiration of the patent when it has become a mere article of manufacture, I am of the opinion that this would not alter the conclusion that the defendant company does not merely repair the lamps, but reconstructs them so that its product of a renewed or refilled lamp is a different product from that of the General Electric

Company. Whether inferior or superior, it is unnecessary to determine.

The following cases, decided in this circuit, while not, perhaps, controlling, since these decisions were made concerning a patented article, and not ·a mere article of manufacture, are to some extent in point. Davis Electric Works v. Edison Electric Light Co., 8 C. C. A. 615, 60 Fed. 276; Edison Electric Light Co. v. Davis Electrical Works (C. C.) 58 Fed. 878; Goodyear Shoe Machinery Co. v. Jackson, 50 C. C. A. 159, 112 Fed. 147, 55 L. R. A. 692.

In the earlier stages of the manufacture of the Edison lamp, and prior to the expiration of the Edison patent, the burned-out lamps were generally thrown away. From about 1895 experiments were made with a view to utilizing and renewing the burned-out lamps. After the expiration of the patent, the business of renewing lamps was begun, and in 1898 the Re-New Lamp Company was organized for the purpose of remaking or reconstructing burned-out lamps. In view of the very large number of electric lamps put upon the market by the complainant and others, and of the fact that the defendants are able to sell their renewed lamps at from 10 to 13 cents each, while the complainant's price is 18 cents, it must be admitted that this business of saving a waste product is a legitimate business, which affords the public the opportunity of a reduction of price. While the renewed lamp comes upon the market in competition with the new lamp, this is a legitimate competition.

There is no evidence that in conducting their business up to October, 1900, the defendants in any way infringed upon the legal rights of the complainant. On the contrary, the evidence shows that the defendants carefully removed the label affixed by the General Electric Company to the outside of the lamp, and in their advertisements and wrappers stated the exact character of their lamps and of their business. Their corporate name itself affords an indication that the defendants had every desire to conduct their business fairly and honorably. It is in evidence that they have employed 100 hands, more or less, and at certain times have turned out 5,000 renewed lamps a day. To these lamps they have affixed their own labels, containing the words "Malden" and "Perfection." There is no charge of any intended or actual deception of the public by these defendants. The complainant stands strictly on its technical rights as the owner of a technical trade-mark.

In October, 1900, the complainant for the first time began to affix to each individual lamp the mark "G. E." The peculiar manner of the attachment of this mark raises new and interesting questions. The Edison label was affixed to the outside of the bulb. It was readily removable, and the defendants did remove it. When the mark "G. E." was affixed, it was not affixed in the same manner as the Edison label, but it was placed within the glass leading-in tube, and pasted to the interior of that tube during the process of manufacture. The defendants term it a "nonremovable label." The complainant says that it can be removed, although it is conceded that this would increase the cost of remaking the lamp. The defendants contend that this act of the complainant is not the· affixing of a trade-mark for

the legitimate purpose of a trade-mark—to indicate the origin of the goods—but that it is a device resorted to with an ulterior purpose, namely, to destroy the utility of the burned-out lamp, and to place the defendants in this dilemma: either to discontinue the business of remaking burned-out lamps which have been manufactured by the Edison Company, or unwillingly to put their lamps forth bearing the trade-mark of the complainant. In support of this contention they say that an inspection of the lamps shows that the label "G. E." is not intended as a guide to the buyer; and it must be admitted that this label, being partially curved, and placed within the leading-in tube, and also within the bulb, is by no means as conspicuous as an external label, though it is visible upon ordinary inspection. The complainant explains this location, saying that labels on the outside of the bulb are easily washed off or removed, but that the label in the stem is safe from accidental removal, and serves as a more permanent means of identifying the lamps. It has not been made to appear, however, that there was any difficulty in this respect with the large number of lamps supplied with external Edison labels; and it does not appear what inducement there would be to ordinary users or sellers of the lamps to remove a "G. E." label if it were affixed to the outside. There certainly is ground for thinking that the complainant, in locating its label in this novel position, had in mind removals in the course of the remaking of lamps, rather than in the ordinary course of trade. Upon the present affidavits I should hesitate very much before arriving at a conclusion that the motive of the complainant was merely the ordinary motive of giving notice to a purchaser that the article is the original product of the maker.

The complainant's affidavits point out the fact that other manufacturers of lamps besides the General Electric Company have adopted the practice of placing a label in the stem of the lamp. Of course, if manufacturers generally adopt this expedient, the business of remaking and refilling lamps may be much impaired, if not destroyed. If we apply to the present case the doctrine of the bottle cases, which hold that a bottle into which is blown the trade-mark of the original bottler cannot be used by another bottler of the same class of goods, even though he affixes labels indicating that he is the manufacturer, there seems reason to believe that the defendants' business will be impaired. In ordinary cases of refilling bottles or packages there is a presumption that such a use has a deceptive tendency, and the courts therefore do not require actual evidence of deception. It is this doctrine which the complainant invokes in this case: that the article contains its trade-mark, and that to put it out without a complete obliteration of this mark would necessarily have a deceptive tendency.

I think, however, there is a very clear distinction between the present case and the ordinary bottle case, where there is usually no excuse or justification for an act which may tend to the deception of the public and to the infringement of the good will of the original bottler. The market is full of bottles without the special trade-mark. Here we find that there has grown up a peculiar business, and a legitimate business, which is useful to the public, as is shown by the reduced price of an electric lamp; a business started in good faith, and an example of one

of those collateral developments along the line of electrical progress. The utilization of by-products and saving of waste is a legitimate business, which should be encouraged. Courts which would be quick to enjoin an unnecessary use of a box or bottle bearing another's trade-mark would be slow to destroy a legitimate and useful business by the extension of the law of trade-marks beyond its proper sphere.

What the complainant seeks to protect is not a trade-mark simpliciter, but a trade-mark so disposed as to prevent or hinder the re-making of lamps, and competition based upon the use of the burned-out lamps. Courts of equity are bound to look to the substantial character of proceedings, and will not suffer the forms of law to be used to effect an ulterior and unavowed object. If the question whether the complainant has a right to apply a trade-mark in such manner as to destroy the usefulness of the burned-out lamp, and thereby extinguish or monopolize the business of making over lamps, is to be decided by a court of equity, it should be upon full hearing and proof and full argument. It may be that the complainant's exclusive property in the trade-mark is so extensive that the mark may be used properly to identify not only its trade product in the market, but its refuse manufactures in the junk heap. It may be that, under some circumstances, a trade-mark remaining upon a worn-out manufacture is a legitimate means of recalling it to the complainant, and of inducing people to send it back to it for a small price because it is of no use elsewhere. Trade-marks blown into glass bottles, or stamped upon metal boxes, are doubtless more or less useful in this way. But there seems to be a substantial difference between a mere receptacle like a box or bottle and an electrical machine or apparatus like an electric lamp. A user of boxes or bottles has a large market to choose from, and can get articles free from the marks of others. A repairer or remaker of electric lamps has no such choice. He can use only electric lamps. If the complainant, with the knowledge of the business of remaking lamps, has chosen to so apply its trade-mark as to prevent its removal in re-making lamps, we have then to consider whether it is entitled to the assistance of a court of equity to relieve it from the chance of a confusion of goods when it has voluntarily and without apparent necessity exposed itself to this chance. If the situation from which the complainant seeks relief is one of its own creation, and if the aid of a court of equity is invoked merely as an instrument for the accomplishment of a piece of business strategy, whereby the complainant is to acquire for itself the profits of a business now in the hands of another, a court of equity might well refuse to become an active agent in such a transaction.

The complainant says that it does not want others to use its trade-mark; but, with full knowledge of the way the business of remaking lamps is carried on, it puts its trade-mark in such a position that every remaker of lamps must use it, or be deprived of his business, or a portion of his profits. It is well settled that a man has not an unrestricted right to the use of his own name when damage to the established business of another will result, and upon like principles a court of equity might regard the use of a trade-mark in a manner unnecessarily injurious to others as a bar to equitable relief.

To repeat: Upon a motion for preliminary injunction the complainant presents the ordinary case of a trade-mark applied to goods sold by the defendants which are not in substance the goods of the complainant. The defendants show facts from which, together with the facts admitted by the complainant, arises a serious doubt whether this is an ordinary trade-mark case, and a doubt whether the complainant has not voluntarily brought about a situation where the defendants are confronted on the one hand with a loss of a legitimate business or a diminution of the profits, and on the other hand with involuntarily selling goods with the complainant's trade-mark visible thereon. I have no doubt that the defendants would very much prefer to leave these trade-marks off if they could do so without substantial loss.

I know of no case involving similar facts. The marked distinction between this case and the ordinary trade-mark case is that ordinarily the owner of the trade-mark is first in the field, while the defendant subsequently uses the mark of the complainant in such a way as to harm its owner, or to subject its owner to peril of harm. In the present case the defendants were first in the field, and the trade-mark is so applied as to do them harm. The complainant does not claim unfair competition of the defendants, but the usual state of things is reversed, and the defendants complain of unfair competition, and of the use of a trade-mark in a manner unnecessarily injurious to them, as a part of an ingenious scheme whose elements are a trade-mark, a novel location thereof which prevents removal, and an injunction to prevent the use of the article without a removal of the nonremovable trade-mark. It must be conceded, I think, that a manufacturer of goods is ordinarily under no obligation to competitors, and is entitled by contract or otherwise to prevent his worn-out articles from being made over and brought into competition with his articles. Whether he can do this by a trade-mark, and whether a court of equity, upon the present bill, can aid him to do so, I am in doubt. It may be that upon a full investigation of the facts it will appear that the complainant's use of its trade-mark in its present position is a natural use growing out of ordinary business considerations. If that fact be established, the doubts as to the complainant's title to relief would probably disappear. The complainant could hardly be required to forego an appropriate and proper application of its trade-mark merely for the reason that incidental business complications might result to the defendants. On the other hand, should it appear that the defendants' contention is well founded; that the peculiar use of this trade-mark was a mere device to place the defendants in a dilemma, and had no substantial relation to the ordinary uses of a trade-mark—there would then remain questions of great importance and novelty, which should be decided only on final hearing.

A further question suggests itself: That is, whether the bottle cases, which rigidly prohibit the use of bottles containing trade-marks, afford a proper guide in case of an electric lamp, which is not a mere receptacle for which substitutes are readily available, but a highly organized apparatus, for which there is no substitute. Certain precautions might well be adjudged insufficient in the case of a bottle on the ground that a defendant had no right to put himself in a

situation where precautions were necessary, while the same precautions of accompanying labels might be held sufficient in the case of an electric lamp on the ground that a defendant had done all that, in the nature of the business, reasonably could be done, and because he had not unnecessarily placed himself in a position where precautions were necessary. See Coats v. Merrick Thread Co., 149 U. S. 562, 13 Sup. Ct. 966, 37 L. Ed. 847. That the defendants' trade-marks "Malden" and "Perfection" have become so well known in the trade as to indicate clearly the origin of the defendants' lamps, and thereby practically obliterate the evidence of origin offered by the complainant's mark within the leading-in tube, is not sufficiently established. It would seem entirely feasible for the defendants to affix to the exterior of their lamps marks which would explicitly indicate the exact character of the goods, and which would not, as do the present marks of the defendants, depend upon trade knowledge for their signification. While I do not at present decide that the defendants are under any legal obligation to change their labels, yet, in view of the suggestion of parties and counsel of their readiness to make all reasonable efforts to avoid confusion of goods, it may not be inappropriate for a court to suggest the course which will tend to do this.

Under all the circumstances, I do not think that the complainant's right is so clear as to warrant the issuance of a preliminary injunction. In Browne on Trade-marks, § 465, it is said:

"If the defendant show a belief that he has a just defense, and is not a willful pirate, then the case should be one of evident mistake of law or fact, or both, in the defense which he sets up, which will justify the festinum remedium."

That the defendants are not willful pirates, and are unwillingly putting forth lamps with the complainant's label therein, seems clear. If they are in the wrong, it is merely for their failure to surrender their profits at the demand of one who stands strictly on its rights as an owner of property.

There is much more in this case than in the ordinary trade-mark case. There is a question of the scope of the uses for which a trade-mark may be applied, and the question how far a court of chancery will lend its aid to relieve a complainant who has voluntarily forced the situation from which he seeks relief, or suffer itself to become an instrument in mere business strategy. I express no opinion upon the merits of this controversy. It is by no means clear that the complainant has done more than it is legally and equitably justified in doing. On the other hand, I am not satisfied that the defendants' case involves an evident mistake of law or fact. The case so far seems a doubtful one, justifying the refusal of a preliminary injunction. It would have been easy for the complainant to have avoided any risk of confusion of goods by so locating its "G. E." label that, like the Edison label, it could have been removed by the defendants. In choosing, for business reasons, to locate it within the inner tube, it voluntarily incurred the risk of confusion of goods, which is the basis of the present action. With full knowledge it assumed a new risk of confusion of goods, and the further risk of litigating novel

points of law.   Under such circumstances, we think that a risk voluntarily assumed before litigation may be continued until the rights of the parties are established on final hearing.·

Petition denied.