CHAMPION SPARK PLUG CO. v. EMENER.

No. 5715.

District Court, E. D. Michigan, S. D.
July 17, 1936.

This is a suit brought by the Champion Spark Plug Company, a Delaware corporation, against Jack Emener, doing business as the Detroit Spark Plug Exchange, a resident of Detroit, Mich., to restrain the defendant from continuing to carry on his business of purchasing, reconditioning, and reselling to the public used spark plugs manufactured by the plaintiff and known as Champion Spark Plugs, on the grounds that by such business the defendant (1) infringes certain patents of the plaintiff, covering the manufacture and sale of spark plugs, (2) infringes the plaintiff's trade-mark, Champion, as used in connection with such spark plugs, and (3) is guilty of unfair competition with the plaintiff. · The jurisdiction of this court is properly based upon the requisite diversity of citizenship accompanied by the statutory amount of the matter in controversy. Pursuant to an order of reference of the cause to me as special master, proofs were taken before me in open court and exhaustive briefs and oral arguments were submitted, to all of which I have devoted most careful consideration, in an earnest endeavor to reach correct conclusions thereon. As a result, I hereby report to the court my findings and conclusions as follows:

### Findings of Fact.

1. The plaintiff has at great cost established and built up an extensive and profitable business in the manufacture and sale of spark plugs, and in connection therewith it has earned and enjoys a wide and valuable reputation and good will among the automobile trade and general public, so that the name "Champion," as applied to spark plugs, has come to mean, in the minds of the public, plaintiff's plugs, possessing a high degree of merit and excellence. The plaintiff owns patents covering its spark plugs, the exclusive right to use the name Champion, both as a trade-mark and as a trade-name, and good will connected with such name and business, all of which are of great value. The said trade-mark is conspicuously stamped upon each spark plug manufactured and sold by the plaintiff, and has been and is extensively advertised throughout the United States, including the state of Michigan.

2. Plaintiff has for many years past employed two methods of advertising its spark plugs and promoting replacement sales thereof to the public. First, it has supplied its Champion spark plugs to man-

ufacturers of automobiles, trucks, tractors, and other automotive-driven apparatus for use as original factory equipment in their respective products. These are supplied at low prices, plaintiff making most of its profits from replacement sales. Nearly 150,000,000 Champion spark plugs have been thus furnished by plaintiff for use as factory equipment. Second, plaintiff advertises its Champion spark plugs to the public through national and trade publications, newspapers, circulars, billboard advertising and other media, and has expended upward of $10,000,000 in this way.

3. Automobile manufacturers endeavor to exercise great care in selecting spark plugs for use as factory equipment. The selection is usually made after severe tests in their engineering and research departments, and they prefer to purchase the plug which the tests show to be best suited to their motor. Slight changes in the dimensions in the firing end of the plug, such as shortening by 1/32 of an inch the projection of the center electrode beyond the insulator, sometimes means the difference between an accepted and a rejected plug for factory equipment. There is keen competition for this equipment business among spark plug manufacturers. Experience has shown that car owners, in replacing a discarded plug, usually purchase the same make of plug if the plugs furnished them by the factory as original equipment have given satisfactory service. Most car manufacturers recommend in their instruction books that owners of their cars purchase for replacements the plug used by the manufacturer for factory equipment on such cars. Plaintiff in its advertisements calls attention to the importance of selecting the correct plugs for replacements.

4. In order to meet the requirements of different motors, plaintiff makes its plugs in a large number of types, many of them differing only slightly from each other. During the past five years plaintiff has made its Champion plugs in approximately 100 different types and its cores in approximately 70 different types. It appears that plaintiff is constantly endeavoring to reduce this number by making each type of Champion plug usable in a large number of different cars. These plugs and cores differ from each other mainly in the dimensions in the firing end of the plug. The important factors are: The distance from the shoulder to the lower end of the insulator, the shape of the lower end of the insulator, the location of the lower end of the insulator with reference to the end of the metal shell, the extent to which the center electrode projects beyond the end of the insulator, and the extent to which the center electrode projects beyond the shell. These differences are illustrated in Exhibit M–11, which shows sectional views of the firing ends of a number of Champion plugs.

5. Plaintiff from year to year has improved its plugs in the quality of the insulator and in other respects, including changes in the dimensions in the firing end of the plug. These changes in the No. 2 and No. 4 Champion plugs are illustrated in Exhibit M–10. Notwithstanding these changes, however, it has been plaintiff's practice to carry the same type numbers on its numerous plugs, with the result that plaintiff's Champion plug of a given type number as made and sold to-day (No. 2, for example) is not the same plug as the No. 2 Champion made and sold by plaintiff a few years ago. A Champion plug of a given type number made and sold by plaintiff four or five years ago is generally unsuitable for giving satisfactory service in the latest model of the automobile for which plaintiff recommends its present plug of that type number. These changes as a rule do not change the external appearance of the plugs, and none but an expert would be able to distinguish between Champion plugs of a given type number made several years apart.

6. Plaintiff's plugs embody center and side electrodes made from a special alloy covered by plaintiff's Rohde Patent No. 1,-529,277, a spark gap between the two electrodes made under, and embodying the features of, plaintiff's Dewar patent No. 1,840,437, and insulators embodying the invention of Rohde Patent No. 1,852,265. Plaintiff's insulators are manufactured in its own plant, which devotes practically its entire energies to the manufacture and improvement of spark plug insulators. It has during the past twenty years expended in this connection more than $1,600,000 in experimental and laboratory work.

7. Although the plaintiff's spark plugs can be, and usually are, used for substantially more than 10,000 miles each, the utility and efficiency of such spark plugs are at their maximum during the first 10,000 miles of their use, and it is desirable, from the standpoint of service and economy,

that motorists should replace such spark plugs with new ones after that amount of use. This, of course, also enables the plaintiff to sell more spark plugs than if such plugs were less frequently replaced. Plaintiff, therefore, has widely advertised to the motoring public the wisdom of limiting the use of each of these spark plugs to 10,000 miles, with the result that many, although by no means all, motorists do follow that course and discard and replace such spark plugs accordingly.

8. Usage of plaintiff's plugs often result eventually in the destruction of the Dewar gap, due to erosion of the electrodes by the jumping of the spark from one electrode to the other across the gap, causes the remaining portion of the center electrode which projects beyond the insulator to break down and lose its homogeneity, and commonly results in the development of gas leakage at the shoulder between the insulator and metal shell and around the center electrode where it passes through the insulator.

9. It is a common and growing practice of automobile owners to purchase new spark plugs from garages, service stations, filling stations, and other similar places where the plugs are installed free of charge by the seller. In such a case often either the car owner drives his car to such a garage or station and has new plugs installed while he waits, or else leaves his car there for checking over and the installation of new plugs when needed, in which case he seldom sees or examines the new plugs before they are installed in the car. A substantial number of the plugs purchased by car owners are purchased and installed in that manner. Usually where plugs are thus purchased and installed the removed plugs are abandoned by the owner and left in the possession of the party who removes them, without any allowance being made for them on the price of the newly installed plugs.

10. Often the spark plugs so discarded have not completely lost their efficiency, but are capable, at least after being cleaned or repaired or both, of further use for several thousand additional miles of travel. These discarded spark plugs, therefore, are purchased by the defendant (as well as by others engaged in the same business) from garages, service stations and other places where they have accumulated, at a few cents each, and are then, by the defendant, cleaned, repaired if necessary and possible, polished, stamped with the word "Used," and resold to dealers, garage men, and others, in cardboard cartons on the outside of which are printed the words, "This spark plug has been used and reconditioned by Detroit Spark Plug Exchange." The word "Used" is stamped by defendant in white on the surface of the hex portion of the plug and may be easily removed. Defendant does not make any representation to the effect that the spark plugs so sold by it are new or are other than used, reconditioned spark plugs. Dealers, however, purchasing such spark plugs from the defendant have, in certain instances, resold them as new Champion plugs, and when such plugs are installed by such a dealer in the automobile of the person to whom they are so sold without being examined by him the latter is deceived accordingly. It does not, however, appear that the defendant has ever authorized or approved such deception. In a number of occasions when new Champion spark plugs were called for reconditioned Champion spark plugs, including those reconditioned by defendant, have been so sold by such dealers on representations that they were new plugs. On other occasions they have been sold without any statement as to whether they were or were not used or reconditioned plugs. In some instances the purchaser has been informed that they were reconditioned plugs.

11. Defendant does not purchase, clean, or repair these abandoned Champion plugs if more than 35 per cent. of the projecting portion of the center electrode has been eaten away by erosion, but may if such erosion is not in excess of that unless the plug is unfit for reconditioning. In his reconditioning operations defendant sometimes files away the eroded portion of the center electrode and rebends the side electrode so as to form a new spark gap, but makes no attempt to restore the Dewar gap; he does not remedy or overcome gas leakage, either at the cap or the shoulder; and he directs a sand blast into the firing chamber of the plug for the purpose of removing accumulations of grease and carbon, the effect of which sand blasting is to remove the glaze from the insulator at the firing end, and, sometimes, to damage or destroy the semipetticoat end of the insulator, which is a functional feature of many Champion plugs. When these reconditioning operations are completed, de-

fendant sorts the plugs by placing those bearing the same type number together, packs each reconditioned plug in a carton bearing the printed matter already quoted, marks thereon the type number which plaintiff placed on the plug when it was manufactured, packs ten cartons of the same type number in a box on which the type number is marked, and sells them to garages, service stations, and dealers, as reconditioned Champion plugs of the designated type number. When there are several different models of the same Champion type number, defendant sorts them according to appearance, but marks and sells them all by the same type number, so that a customer who purchases half a dozen boxes of a given type number may receive several different models made at different times.

12. The price at which these spark plugs are sold by the defendant to dealers, garages, and service stations is less than one-half the price charged by the plaintiff for new spark plugs, and it is a fair inference that such sales by the defendant (and by others engaged in the same business) reduce the number of new spark plugs sold by the plaintiff, with resultant loss to it, although to what extent it is impossible to determine with reasonable certainty.

13. It appeared in evidence that representatives of plaintiff purchased 80 reconditioned Champion plugs direct from defendant and about an equal number from garages and dealers, the latter including some plugs reconditioned by defendant and some by others. The 80 reconditioned Champion plugs purchased direct from defendant were subjected to plaintiff's regular leakage tests, and none of them passed such tests. Forty of these plugs so purchased direct from defendant were tested in a motor and each set of eight plugs developed bad preignition in from one to three minutes, whereas sets of new Champion plugs of the same type number subjected to the same test for five minutes showed no preignition, nor did they show preignition under more severe conditions of operation for another five minutes. One or two, and in some instances, all of the dimensions in the firing end of these plugs had been altered by defendant's reconditioning operations. Of five boxes (50 plugs) sold by defendant in 1933 as Champion No. 4 plugs none contained the dimensions in the firing end which it had when originally made and sold by plaintiff. Twenty-one of these 50 plugs contained cores which were discontinued by plaintiff in 1924; 23 contained cores which were discontinued by plaintiff in 1929, and only six contained the cores which plaintiff has used in its No. 4. plugs since July 15, 1929. These different cores are not interchangeable. In addition to the changes in the design of these cores since 1924, plaintiff has during that period repeatedly improved the quality of the insulating material from which its cores are made.

14. The standard dimensions in the firing end of the Champion No. 4 plug as manufactured and sold by plaintiff since August 15, 1929, have been $\frac{9}{64}$ inch from the tip of the core to the end of the center wire, $\frac{5}{64}$ inch from the tip of the core to the end of the shell, and the center wire projects $\frac{4}{64}$ inch outside the shell. In 50 plugs purchased direct from defendant in 1933 as Champion No. 4 plugs reconditioned by defendant, the distance from the tip of the core to the end of the center wire varied between $\frac{5}{64}$ inch and $\frac{14}{64}$ inch; the distance from the tip of the core to the end of the shell varied between $\frac{2}{64}$ inch and $\frac{13}{64}$ inch, and the location of the end of the center wire and therefore of the spark varied from $\frac{2}{64}$ inch inside the shell to $\frac{6}{64}$ inch outside the shell. (Exhibit M–17.) Plaintiff considers these dimensions to be of great importance in its various plugs, all of its plugs being manufactured to a combination of blueprints and shop specifications. Three blueprints of each type Champion plug are provided for plaintiff's mechanics (Exhibits M–13A to M–13C), and the shop specifications permit tolerances of only plus or minus five thousandths of an inch and on some dimensions no tolerance whatever is allowed. The aforementioned variations in the dimensions in the 50 plugs are greater than those existing between different types of plaintiff's new Champion plugs. For example, as appears from Exhibit M–11, the only difference between new Champion C–4 and Champion C–4–X plugs is that in the C–4 plug the core projects $\frac{7}{32}$ inch beyond the shell as against $\frac{5}{32}$ inch in the C–4–X. From the same exhibit it appears that the only differences between new Champion No. 3 and No. 4 plugs are that the distance from the shoulder to the tip of the core is $\frac{1}{16}$ inch longer, the distance from the tip of the core to the end of the center wire is $\frac{1}{32}$ inch longer, and the dis-

tance from the tip of the core to the end of the shell is 1⁄32 inch more in the No. 3 than in the No. 4.

15. The changes made by plaintiff in its plugs during the past ten years have not changed the general appearance of the plugs, and the average user cannot tell by examining one of plaintiff's plugs whether it was made in 1933 or ten years earlier, nor is it possible for the average purchaser of spark plugs to distinguish, without an explanation, between plaintiff's new Champion plugs and defendant's reconditioned Champion plugs. There are certain telltale marks in the firing end of these plugs which enable an expert to distinguish a reconditioned plug from a new one, but these are unknown to, and unobserved by, the average purchaser of spark plugs.

16. I am satisfied by the evidence, and I find, that the defendant does not recondition, nor attempt to recondition, any spark plug whose utility has already been totally, or substantially totally, destroyed, or which he considers unfit for reconditioning, and that he does not make any addition to the spark plugs in question, but merely cleans and reconditions, without reconstructing, such spark plugs. I am also convinced by the record, and I find, that many of the used spark plugs so reconditioned and sold by the defendant are, after such reconditioning, capable of rendering considerable further service as spark plugs, although not to the same degree or extent as new spark plugs.

17. Although it does not appear that the defendant deceives, or intends to deceive or injure, any one, it is plain from the record, and I find, that not only the actual result, but also the natural and ordinary result, of his acts and practices here involved is to permit and assist his customers to deceive the public, to the injury of the plaintiff, by selling spark plugs, originally made by the plaintiff but partly worn out by use and reconditioned by the defendant, under representations or circumstances reasonably calculated to lead the average purchaser to believe that such plugs are new Champion plugs, and, in some instances by express misrepresentations to that effect.

## Conclusions of Law.
### Patent Infringement.

1. Whether the acts of the defendant here complained of amount to an infringement of any patent of the plaintiff depends upon the question whether such acts constitute a reconstruction of the spark plugs involved or merely a repair of such spark plugs. If, for example, the defendant acquired spark plugs which had fully performed their purpose and had no further value except as scrap, and should then refabricate or refashion such spark plugs so as to recreate the functional properties thereof which had been exhausted or destroyed, he would undoubtedly be effecting a reconstruction of such spark plug, and would, therefore, be guilty of an infringement of the applicable patent. American Cotton Tie Co. v. Simmons, 106 U.S. 89, 1 S.Ct. 52, 27 L.Ed. 79; Davis Electrical Works v. Edison Electric Light Co. (C.C.A.1) 60 F. 276; National Phonograph Co. v. Fletcher (C.C.) 117 F. 149; Miller Hatcheries v. Buckeye Incubator Co. (C.C.A.8) 41 F.(2d) 619. In view, however, of the facts already stated, as hereinbefore found, I cannot avoid the conclusion that the defendant has merely exercised the right which, in my opinion, he had, to make what are, in substance and effect, repairs to these spark plugs, and, therefore, that he has not thereby infringed any patent of the plaintiff. Goodyear Shoe Machinery Co. v. Jackson (C.C.A.1) 112 F. 146, 55 L.R.A. 692; Oliver Typewriter Co. v. American Writing Machine Co. (C.C.) 156 F. 177; National Malleable Casting Co. v. American Steel Foundries (C.C.) 182 F. 626; Foglesong Machine Co. v. J. D. Randall Co. (C.C.A.6) 239 F. 893; Ely Norris Safe Co. v. Mosler Safe Co. (C.C.A.2) 62 F.(2d) 524. In the language of the Circuit Court of Appeals for the Sixth Circuit in Foglesong Machine Co. v. J. D. Randall Co., supra, 239 F. 893, at page 895: "The question for decision is: Did the defendant repair or reconstruct the machine which it purchased? * * * The defendant merely returned to use injured or lost portions of the mechanism. This constitutes repairing, and not reconstruction. * * * The machine was not so broken and worn out as to require replacement. The wear and injury were but partial. Under such circumstances, repair is not reconstruction, but restoration, that the mechanism may be kept up to the full performance of its duty."

Nor can I agree with the contention of the plaintiff that this right to repair and resell is limited to the purchaser of the patented article from the patentee and

those deriving their title thereto from such purchaser. That right, in my opinion, survives any abandonment of said article, is possessed by any subsequent owner thereof, and is based on the public policy which invalidates any attempt by the patentee to restrict such right. The applicable rule was thus stated by the Circuit Court of Appeals for the First Circuit in Goodyear Shoe Machinery Co. v. Jackson, supra, 112 F. 146, at page 149, 55 L.R.A. 692: "When the patented machine has passed outside the monopoly by a sale and purchase, the patentee has no right to impose any restrictions on its use for his own benefit. He cannot forbid the further use of the machine because it is out of repair in consequence of the wearing out or breaking of some of its parts."

The contention of the plaintiff to the contrary cannot be sustained.

### Unfair Competition.

2. The facts and circumstances already mentioned necessarily make it both easy and natural that spark plugs manufactured by the plaintiff, but partially worn out by use and reconditioned by the defendant as aforesaid, should be sold by unscrupulous customers of the defendant in such a manner as to deceive, sometimes expressly and sometimes by implication, purchasers desiring new Champion plugs into the belief that such reconditioned plugs are new ones, and it is not surprising that this is the result of the practices of the defendant here complained of. It is, of course, elementary and fundamental that a person is legally chargeable with having intended to cause whatever is the natural and ordinary result of acts knowingly committed by him. So, it is a rule, too well settled to require the citation of authority, that even where, as here, a defendant does not actually intend to deceive any one, his acts may constitute unfair competition within the meaning of the law, if that is the ordinary and probable result of such acts; and as the sale, by customers of defendant, to the public, of reconditioned plugs when Champion plugs are called for is a fraud on the public and unfair competition· with plaintiff, the result of which is to deprive it of the sale of new Champion plugs and to injure its reputation and good will, and as the defendant sells these plugs to his customers for resale to the public, and thereby furnishes to them the means of, and temptation for, their deceiving the public and thereby injuring the plaintiff as already shown, he cannot escape responsibility for the resulting deception and injury on the plea that he did not himself deceive any one nor instruct or authorize his customers to do so. Federal Trade Commission v. Winsted Hosiery Co., 258 U.S. 483, 42 S. Ct. 384, 66 L.Ed. 729; William R. Warner & Co. v. Eli Lilly & Co., 265 U.S. 526, 44 S.Ct. 615, 68 L.Ed. 1161; Coca-Cola Co. v. Gay-Ola Co. (C.C.A.6) 200 F. 720; Samson Cordage Works v. Puritan Cordage Mills (C.C.A.) 211 F. 603, L.R.A.1915F, 1107; O. & W. Thum Co. v. Dickinson (C.C.A.) 245 F. 609; Helmet Co. v. Wm. Wrigley, Jr., Co. (C.C.A.6) 245 F. 824; Auto-Acetylene Light Co. v. Prest-O-Lite (C.C.A.) 264 F. 810; Rymer v. Anchor Stove & Range Co. (C.C.A.) 70 F.(2d) 386. In Warner & Co. v. Eli Lilly & Co., 265 U.S. 526, at page 530, 44 S.Ct. 615, 617, 68 L.Ed. 1161, the Supreme Court said: "That no deception was practiced on the retail dealers, and that they knew exactly what they were getting, is of no consequence. The wrong was in designedly enabling the dealers to palm off the preparation as that of the respondent." The plaintiff is in my opinion entitled to relief in this connection, as hereinafter indicated.

### Trademark Infringement

3. The question now to be considered is whether defendant's use, as already indicated, of the word "Champion" and the word and letter "Champion X" constitutes an infringement of plaintiff's registered trade-marks Champion and Champion X.

In Merriam Co. v. Saalfield (C.C.A.) 198 F. 369, at page 372, Judge Denison said that "the entire substantive law of trade-marks (excepting statutory provisions and construction) is a branch of the broader law of unfair competition." It cannot be doubted that the retention of plaintiff's trade-marks on its plugs after they have been reconditioned by the defendant plays an important part in the unfair practices complained of. It is the first thing which a purchaser is likely to notice if he examines one of ·these plugs. Seeing it displayed, as it is, more prominently than any other words on the plug, he is likely to overlook any such other words and, not being informed to the contrary, to believe that it is a new Champion plug of comparatively recent manufacture, backed by plaintiff's guaranty and reputation, rather than the partly worn and reconditioned plug that it really is, a plug

originally made by plaintiff but no longer having the potential life, efficiency, or value of a new plug.

█ Where one makes use of the trade-mark of another to sell one's own goods, the burden is on him to justify such use. Jacobs v. Beecham, 221 U.S. 263, 31 S.Ct. 555, 55 L.Ed. 729. The plug here involved has undergone such changes, since its manufacture and sale by the plaintiff, that it no longer can be said truly to represent the quality usually associated with, and belonging to, plaintiff's product when first made and sold by plaintiff, the product by which it made its reputation with the public. The plaintiff, therefore, is entitled to prevent its resale to the public under his trade-mark. General Electric Co. v. Re-New Lamp Co. (C.C.) 121 F. 164; Id. (C.C.) 128 F. 154; Coca-Cola Co. v. Bennett (C.C.A.) 238 F. 513; Ingersoll v. Doyle (D.C.) 247 F. 620; Auto Acetylene Light Co. v. Prest-O-Lite Co. (C.C.A.) 264 F. 810; Bourjois & Co. v. Katzel, 260 U.S. 689, 43 S.Ct. 244, 67 L.Ed. 464, 26 A.L.R. 567; Prestonettes, Inc., v. Coty, 264 U.S. 359, 368, 44 S.Ct. 350, 68 L.Ed. 731.

In General Electric Co. v. Re-New Lamp Co. and Ingersoll v. Doyle, supra, the defendants were required to remove or obliterate from the goods trade-marks which had been affixed thereto by plaintiffs who had manufactured such goods. In the case last mentioned the defendants purchased new Ingersoll watches and made some slight change or modification therein before placing them on the market for sale to the public. The court said (247 F. 620, at page 621): "I consider it clear that no attempt to justify the defendants' doings above referred to could succeed. In effect, they are sales of watches under representations that the watches sold are made and guaranteed by the plaintiffs. But such representations are untrue. An Ingersoll watch of either grade referred to, or of any grade, after the defendants' additions thereto or alterations therein have been made, is no longer what its makers offer to the public as a guaranteed Ingersoll watch." The defendants were enjoined "from selling or offering for sale or delivering to others for sale any watch as an Ingersoll watch, which, though originating in the complainants' factory, has been altered or added to so that it no longer is in its entirety the product of" the complainant.

In Coca-Cola Co. v. Bennett (C.C.A.8) 238 F. 513, at page 517, defendant was enjoined from bottling and selling as Coca-Cola a beverage made from genuine Coca-Cola syrup, the court saying: "Counsel for the defendants argue that, as it appears that defendants use the bottling syrup of the appellant and mix the same with carbonated water in the same way that appellant authorizes other persons and corporations to do, they have the right to manufacture and sell under the appellant's trade-mark. But suppose that other persons and corporations without number should be of the same opinion; it would result that appellant would have no control over the integrity of its trade-mark, which is its guaranty that the beverage is as represented, and its business might be ruined. It is true the defendants might sell the bottling syrup which they buy under the appellant's trade-mark; but, since they change the syrup into a beverage without the permission and authority of appellant, they have no right to sell the same under appellant's trade-mark. The argument advanced is also faulty, as it would permit persons other than the owner of the trade-mark to control its use."

In Auto Acetylene Light Co. v. Prest-O-Lite Co. (C.C.A.6) 264 F. 810, 813, defendant was selling its own acetylene gas in plaintiff's tanks. The Circuit Court of Appeals for the Sixth Circuit affirmed a decree for plaintiff enjoining the defendants from refilling plaintiff's tanks without replating or enameling the outer surface thereof, "so that the name of the Prest-O-Lite Company and the words 'Prest-O-Lite' and all complainant's labels shall be obliterated to the complete extent that either plating or enameling can be made to so obliterate, and such obliteration by plating or enameling shall not be dispensed with, no matter how such name and trade-mark or labels appear, whether plated, etched, or otherwise, and in addition thereto plating or stamping on the outer surface of the tank in legible and permanent form a notice that such tank has been refilled or recharged by defendants or their agents."

In Prestonettes, Inc., v. Coty, 264 U.S. 359, 44 S.Ct. 350, 351, 68 L.Ed. 731, the court prescribed the limit to which a defendant may properly go in making use of plaintiff's trade-mark in connection with the resale by such defendant of goods originally made and sold by plaintiff under

said trade-mark, and intimated that it might go further in a suit for unfair competition. Plaintiff was a French concern which owned registered trade-marks "Coty" and "L'Origan" for toilet powders and perfumes. Defendant purchased plaintiff's genuine powder, subjected it to pressure, and added a binder to give it coherence, and it purchased plaintiff's genuine perfume in bottles and sold it in smaller bottles. It was not contended that defendant adulterated or otherwise deteriorated these products. The court approved a decree entered by the District Court which enjoined defendant from using the words "Coty" or "L'Origan," except that it was permitted to use those words on labels affixed to defendant's containers and stating "Prestonettes, Inc., not connected with Coty, states that the contents are Coty's (giving the name of the article) independently rebottled in New York," or repacked in New York, every word of the statement "to be in letters of the same size, color, type and general distinctiveness." In this connection Mr. Justice Holmes said: "If the name Coty were allowed to be printed in different letters from the rest of the inscription dictated by the District Court a casual purchaser might look no further and might be deceived."

He said further: "This is not a suit for unfair competition. It stands upon the plaintiff's rights as owner of a trademark registered under the Act of Congress. The question therefore is not how far the court would go in aid of a plaintiff who showed ground for suspecting the defendant of making a dishonest use of his opportunities."

The principle underlying those cases, and applicable here, is that the owner of a trade-mark is entitled to prevent its use, even on an article originally manufactured and sold by himself, in connection with the resale, by another person, of such article after it has lost its original character and excellence which such trademark indicates and represents to the public. Applying this principle to the present case, as the plugs of the plaintiff, when resold by the defendant, often have been so affected, by their use or reconditioning or both, that their efficiency and usefulness and value have been substantially impaired and they therefore are products of the plaintiff which, in a very real sense, have been altered and have become plugs in-

ferior to the plugs known and purchased by the public under the trade-mark, Champion, their sale under that trade-mark constitutes an infringement thereof which plaintiff is entitled to have restrained.

### Relief to be Granted.

4. Having reached the conclusion that defendant has infringed plaintiff's trade-marks and committed acts of unfair competition against the plaintiff, it remains to consider the character and scope of the relief to which plaintiff is entitled. Defendant should be enjoined from continuing its said infringement and unfair competition. The exact form of the injunction presents some difficulty. It should not prevent defendant from cleaning and reconditioning Champion plugs for his own use or for the owners of such plugs, but defendant should not be permitted to perform such service for others with the purpose and intent of placing such plugs in the channels of trade to be sold to the public as Champion spark plugs, unless the conditions prescribed herein in connection with the sale of defendant's own reconditioned "Champion" plugs have been fully complied with. On the other hand, plaintiff is entitled to effective relief against unfair competition and infringement of its trade-mark. The Supreme Court, in Warner & Co. v. Eli Lilly & Co., 265 U.S. 526, 532, 44 S.Ct. 615, 618, 68 L.Ed. 1161, which was an unfair competition case, said: "But respondent being entitled to relief, is entitled to effective relief; and any doubt in respect of the extent thereof must be resolved in its favor as the innocent producer."

The defendant should be required to give effective notice to the public that his used and reconditioned plugs are not new Champion plugs. The mere stamping of the word "Used" on the side of the plug, as is now done, is not sufficient notice, nor is the mere printing of a notice on the boxes, wrappers, or individual containers, for the reason that often these do not come to the attention of the purchaser. Any notice easily detachable or removable which the defendant might attach to the plugs would not be adequate, as a dealer who would sell a used plug for a new one would probably not hesitate to remove such a notice. The Supreme Court has said that the notice must be of such character "as will unmistakably inform the public" of the facts. Singer Mfg. Co. v. June Mfg. Co., 163 U.S. 169, 200, 16 S.Ct. 1002,

1014, 41 L.Ed. 118. The rule has been variously expressed by the courts, as indicated by Judge Knappen in Knabe Bros. Co. v. American Piano Co. (C.C.A.6) 229 F. 23, 31, who there said:

"The rule, as variously stated, is that defendant must accompany the use of its name 'with the explanation' (Merriam Co. v. Saalfield, 117 C.C.A. 245, 198 F. [369] at page 375); it must 'unmistakably inform' the public that the article [is] of its production (Singer Mfg. Co. v. June Mfg. Co., 163 U.S. [169] at page 200, 16 S. Ct. 1002, 41 L.Ed. 118); it must so distinguish that 'no one with the exercise of ordinary care can mistake' (Saxlehner v. Eisner, 179 U.S. [19] at page 41, 21 S.Ct. 7, 45 L.Ed. 60); it must give 'the antidote with the bane' (Herring-Hall-Marvin Safe Co. v. Hall's Safe Co., 208 U.S. [554] at page 559, 28 S.Ct. 350, 52 L.Ed. 616); it must be 'clearly made to appear' that the goods were defendant's, and not those of plaintiff or its predecessors (Davids v. Davids, 233 U.S. [461] at page 471, 34 S.Ct. 648, 58 L.Ed. 1046); the name cannot be used 'without also giving information to the public' that it is not the business formerly carried on by Wm. Knabe & Co. (Hall's Safe Co. v. Herring-Hall-Marvin Safe Co., 76 C.C.A. 495, 146 F. at pages 37, 44, 14 L.R.A.(N.S.) 1182); in other words, the means adopted must be adequate to fully prevent confusion."

In Coca-Cola Co. v. Gay-Ola Co. (C.C. A.6) 200 F. 720, 724, the court held that defendant should be enjoined from using a particular color for its syrup unless by other means it could safeguard against fraud in the sale of its products.

A spark plug does not readily lend itself to any form of printed notice that clearly would be effective to distinguish defendant's reconditioned Champion plugs from plaintiff's new Champion plugs. Painting the metal parts of defendant's plugs red or some other distinctive color would tend to lessen the confusion between them and plaintiff's new plugs. A similar requirement was imposed upon defendant by Judge Learned Hand in Champion Spark Plug Co. v. A. R. Mosler & Co. (D. C.) 233 F. 112, 117. The appearance of the plugs might be changed further by milling or grinding off the knurled portion of the base and the ribs on the porcelain, which the evidence shows could be done at slight expense and without affecting the functioning of the plugs, but this should

not be required unless the changes hereinafter specified prove to be ineffective to prevent the sale to the public of defendant's reconditioned Champion plugs as and for new Champion plugs.

Specifically, the decree should provide for an injunction against defendant, enjoining him, his agents, attorneys, salesmen, workmen, employees, servants, privies, and confederates from selling or offering for sale or delivering to others for sale any spark plug, spark plug core or spark plug porcelain of plaintiff's original manufacture, which has been used and thereafter, for purposes of resale to the public, has been reconditioned or treated in any manner by defendant or others to give it the appearance of newness, unless and until (a) all trade-marks, trade-names, style marks, size marks, and/or brand marks have been completely removed therefrom, as by sandblasting or as by the use of acid or otherwise; (b) the metal shell and bushing nut have been completely covered by red paint or lacquer, such as Duco or Dulux or otherwise; and (c) the word "Used" has been indented in one face of the hex portion of the metal shell of said plug, in a size, and to a depth, sufficient to enable such indentation to retain enough white paint to distinctly display each letter of said word in white when the surplus white paint has been wiped from said surface, and the letters of the word "Used" have been filled with a heavy white paint, so as to leave each letter of the word "Used" fully and distinctly visible in white on the red background previously placed thereon, as above required. The letters of the word "Used" should all be capital letters of a size not smaller than twelve-point type, i. e., six lines to an inch when set without spaces between the lines.

The proofs clearly show that each of the aforementioned requirements can be complied with by defendant without damaging or affecting the functioning of spark plugs of plaintiff's manufacture as the same have been manufactured and sold up to the present time; that with but small expense for equipment defendant should be able, by hand operations, to comply with all of such requirements at a total cost for labor and materials of approximately one-half cent (½) per plug, and that a substantial part of such cost would be offset by the present cost of applying black lacquer to the metal parts of the shell and

bushing, which forms a part of defendant's regular reconditioning operations.

Should plaintiff change the method of applying its trade-marks, so that the same are no longer readily removable by sandblasting or by acid or otherwise, defendant should be permitted to apply to the court for a modification of the provisions of clause (a) above, so as to enable him to permanently and completely obliterate plaintiff's marks from the plugs by covering them with a heavy lacquer such as Duco or Dulux or otherwise.

### Accounting.

5. In view of the defendant's apparent good faith and not unreasonable belief that he was doing all that could be expected of him in the way of avoiding deception of the public, and it appearing uncertain as to whether the plaintiff could establish sufficiently definite and substantial injury from the past acts of the defendant to justify the expense of an accounting, I am not satisfied that plaintiff has sustained the burden of showing that it is entitled to such an accounting. Baker v. Baker (C.C.A.2) 115 F. 297; G. & C. Merriam Co. v. Ogilvie (C.C.A.1) 170 F. 167; Moline Pressed Steel Co. v. Dayton Toy & Specialty Co., 30 F.(2d) 16 (C.C. A.6); W. G. Reardon Laboratories, Inc., v. B. & B. Exterminators, Inc., 71 F.(2d) 515 (C.C.A.4).

### Costs.

6. In the language of Judge Learned Hand in Champion Spark Plug Co. v. A. R. Mosler & Co. (D.C.) 233 F. 112, 117, which, in my opinion, is equally applicable here, "I see no occasion for costs, and each party will bear its own disbursements. The case appears to me one of honest trade differences."

Wilber Owen, of Toledo, Ohio (Owen & Owen, of Toledo, Ohio, and W. E. Talcott, of Detroit, Mich., on the brief), for plaintiff.

S. Brooks Barron, of Detroit, Mich., for defendant.

MOINET, District Judge.

This matter is before the court on exceptions filed by the parties, respectively, to the report of the special master, in which report said master presents full and complete findings of fact and conclusions of law, and ample briefs were filed by counsel herein.

Plaintiff seeks injunction herein restraining defendant from infringing certain patents of plaintiff, covering the manufacture and sale of spark plugs; infringing the plaintiff's trade-mark, "Champion," identifying such spark plugs, as well as restraining unfair competition with said plaintiff.

Upon the first contention, the master found non infringement.

Upon the second contention, the master found that the defendant was guilty of unfair competition, and determined that plaintiff is entitled to relief as indicated in said report.

Upon the last contention, the master found that the defendant was guilty of infringement of trade-mark, and recommended relief as indicated in said report.

Upon the question of accounting, the master determined that from all of the facts presented it was uncertain as to whether the plaintiff could definitely and sufficiently establish definite and substantial injury from the acts of the defendant to justify the expense of an accounting and that the master was not satisfied that plaintiff had sustained the burden of showing its right to such accounting, no accounting was allowed.

After careful study of the facts presented herein, as well as the authorities set forth by the master, and after a careful consideration of the full and complete briefs filed by counsel herein, the court is firmly of the opinion that the master arrived at the correct conclusions upon such facts, and therefore, it is hereby ordered that such exceptions filed herein, respectively, are overruled, and the findings and conclusions of the master are hereby confirmed, and the report of such master is hereby adopted by the Court.

The question of costs remains. The plaintiff sought a speedy hearing, and at its request, the matter was referred to the master so that the questions involved could be expeditiously presented and determined; the master cites authority indicating that no costs should be allowed and that each party would bear their own costs. The court, after considering all of the facts herein, and the situation of the parties hereto, is of the opinion that no costs shall be allowed, and that each party is left to pay their own disbursements.

As to the item of $250, costs for services of the master, the court determines

from all of the facts and circumstances involved herein, and the situation of the parties hereto, that the plaintiff shall pay this sum.

Accordingly a decree may be settled herein, providing the relief indicated, and granting permanent injunction as indicated in the report of the special master.

Findings of fact and conclusions of law, under equity rule, may be prepared and presented to the court.