CHAMPION SPARK PLUG CO. v. A. R. MOSLER & CO.

SAME v. BENFORD MFG. CO.

(District Court, S. D. New York. May 24, 1916. On Motion to Settle Decree, June 12, 1916.)

1. TRADE-MARKS AND TRADE-NAMES ⬤⟿75—UNFAIR COMPETITION—EVIDENCE.

Where a manufacturer copies the product of a manufacturer with an established reputation, so that confusion amongst buyers is likely to result, evidence of successful deception is unnecessary to entitle the injured manufacturer to relief.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 86; Dec. Dig. ⬤⟿75.]

2. TRADE-MARKS AND TRADE-NAMES ⬤⟿70(1)—UNFAIR COMPETITION—WHAT CONSTITUTES.

Complainant sold spark plugs to the Ford Motor Company practically at cost, making its profit out of new plugs necessarily purchased by car owners. Defendant manufactured spark plugs so closely copying complainant's plugs that buyers might well be deceived. *Held*, that complainant was entitled to relief against such unfair competition.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 81; Dec. Dig. ⬤⟿70(1).]

3. TRADE-MARKS AND TRADE-NAMES ⬤⟿100—UNFAIR COMPETITION—RELIEF.

In such case, as the buyers of cars which would ordinarily be equipped with complainant's plugs would not be familiar with the cartons in which the plugs were sold, dissimilarity as to such cartons is no ground for denying relief, and defendant will be required, where the change

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

could be made at a trifling cost, to color its plugs, and so distinguish them from the plugs of complainant.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 114; Dec. Dig. ☞100.]

4. TRADE-MARKS AND TRADE-NAMES ☞70(1)—UNFAIR COMPETITION.

The mere copying of a design is not unfair trade. The imitation must include elements which do not affect the buyer's choice by their inherent attraction, and which have come in fact to signify the plaintiff's make.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 81; Dec. Dig. ☞70(1).]

5. TRADE-MARKS AND TRADE-NAMES ☞101—COSTS—ALLOWANCE—RIGHT TO ALLOWANCE.

Where, in a suit for unfair competition, the questions involved were honest trade differences, complainant, though granted relief, is not entitled to costs and disbursements.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 115; Dec. Dig. ☞101.]

6. TRADE-MARKS AND TRADE-NAMES ☞100—UNFAIR COMPETITION—RIGHT TO ADVERTISE DECREE.

Where complainant secured a decree enjoining defendant from continuing to manufacture spark plugs in appearance almost identical with its own, but it appeared that the questions involved were honest trade differences, complainant should not be allowed to advertise the decree.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 114; Dec. Dig. ☞100.]

In Equity. Bill by the Champion Spark Plug Company against A. R. Mosler & Co. Decree for complainant. Rehearing in the above case, together with the rehearing in the suit by the same complainant against the Benford Manufacturing Company.

This is a bill in equity, dependent on diverse citizenship, to procure an injunction against the defendant for unfair competition in the sale of spark plugs to be used in the Ford motor car. The plaintiff is a Massachusetts corporation, and the defendant a New York corporation, each concerned in the manufacture of spark plugs for motors. On the 22d of February, 1911, the plaintiff procured a contract from the Ford Motor Car Company for the manufacture and sale of 10,000 of a plug which was designed to fit the engine of that car and which they called the "Champion X." Later in that year they sold 239,500 more plugs to the same company. During the year 1912, and for all subsequent years down to the present, the Ford Motor Car Company has used the plaintiff's "Champion X" plug for the factory equipment of its cars, except for a few contracts hereafter mentioned, which were procured by the defendant. In all, the plaintiff has sold to the Ford Motor Car Company a total of more than 4,000,000 of said plugs, which were in some respects different from those theretofore manufactured by the plaintiff and from those used by the Ford Motor Car Company. They are known as the open type, in which the two electrodes, between which the spark leaps, consist of pieces of wire, one straight and the other bent up at an acute angle. The steel shell of the plug is of a black finish, with the hexagonal part, for the wrench to engage, extending above the top of the engine of a predetermined size and length. Above the shell there is a bushing nut, designed to hold in place an insulating porcelain, which in turn holds the straight electrode. This porcelain has concealed within the shell a lower extension, known as the petticoat, and only the upper part projects above the bushing nut, showing a white cylindrical surface of somewhat more than half an inch. Above the white porcelain there is a brass nut, and above the brass nut a brass screw. Between the brass nut and the screw is held the wire from the magneto, which carries the current down the straight electrode.

On the face of the part of the porcelain above the bushing nut are printed the words, "Champion X" in red letters.

It has always been the custom of the plaintiff to sell these plugs to the Ford Motor Car Company at substantially their cost, relying for its profits upon the replacements which users of the car must buy as the plugs wear out. These replacement plugs the plaintiff sells to jobbers at anywhere from 25 cents to 30 cents apiece, and the jobbers and repair men retail them to the trade at a list price of 75 cents, which in practice is reduced to 50 cents or less. In the Ford Manual, which is issued to all buyers of the Ford car, the Ford Motor Car Company recommends the replacement of these plugs by the same equipment with which the car is sold, and the plaintiff, both through this recommendation and the fact of the use of them in the car itself, has established a large sale of its plugs in replacement, with much profit. Besides this, the plaintiff has spent large sums of money in advertising its plug and in exploiting it through traveling salesmen.

Until the year 1913 the defendant advertised and recommended for use upon Ford cars a plug of its own manufacture, which it called the "Spitfire." This was of a different type from the "Champion X," having a closed bottom and nickeled shell. The porcelain which extended above the bushing was also of a somewhat different size, and bore the legend, "Mosler's Spitfire." In the year 1913 the plaintiff procured from the Ford Motor Car Company an order for 10,000 plugs to be made after a blueprint submitted at the time, which was in turn made exactly after the plaintiff's plug. This order the defendant filled, and later got further orders from the Ford Company, amounting in all to about 100,000 plugs, both in this country and Canada. Having made the plug, which was nearly indistinguishable from the plaintiff's, it continued, however, to supply it to jobbers and repair men for use as replacement of the Ford equipment, and has established a substantial business itself. The "hex" of the defendant's plug is slightly longer than the plaintiff's, and the porcelain is thicker in diameter and slightly shorter in length; the nut above the porcelain is knurled, instead of hexagonal, and the name "Mosler Superior" is printed on all the porcelains. Nevertheless, it is not disputed that the two plugs, unless placed side by side, are not distinguishable to an inexpert eye, except by the substitution of the words "Mosler Superior" for "Champion X." Each has the shell and bushing nut finished in a dull black color, each has a white porcelain, and each a brass top nut. The replacement plugs are sold in separate cartons, and the general appearance of the plaintiff's carton is absolutely dissimilar from the defendant's. No claim of unfair competition is made of the cartons.

The plaintiff's position is that the change in the defendant's plug, from its former easily distinguishable "Spitfire" to the absolute copy of the plaintiff's "Champion X," results in substitution of the one for the other to buyers who seek replacement plugs. It proved some instances of such substitution by retail dealers, without the connivance of the defendant. It also proved that nine other kinds of plugs had in the past been sold for use in Ford cars, all readily distinguishable from its own and all suitable for the purpose.

The defendant replied by asserting that all parts of its plug, and the proportion of those parts, were functional in its plug, and that none could be changed without affecting either its cost or its value in use. It appeared that all the parts were necessary, but there was some dispute as to the form of the electrodes, the length of the "hex," and that of the porcelain above the bushing nut.

Livingston Gifford, of New York City, and Wilber Owen, of Toledo, Ohio, for plaintiff.

William A. Redding and Ambrose O'Shea, both of New York City, for defendant A. R. Mosler & Co.

C. A. Weed, of New York City, for defendant Benford Mfg. Co.

LEARNED HAND, District Judge (after stating the facts as above). [1,2] In cases of this character the question is always in the nature of a compromise between the plaintiff's security in his trade and the annoyance and expense imposed upon the defendant by im-

posing conditions upon him. Where it is equally easy for the defendant to adopt a new make-up, and the plaintiff is in real danger of losing future customers, courts do not hesitate; even when the change is somewhat burdensome to the defendant, they will at times intervene. That the plaintiff's trade in replacement plugs is imperiled by the "Mosler Superior" seems to me quite possible, and, though no evidence of successful deception is produced, it is not necessary to do so. Collinsplatt v. Finlayson (C. C.) 88 Fed. 693. The plugs were confessedly originally made in exact accordance with the Ford blueprint, and are now structurally distinguishable only by such slight differences as would inevitably escape the eye, unless they are placed side by side. They are in color precisely like the plaintiff's plugs, except for the name upon them, and dealers have attempted to pass them off as such. It seems to me, therefore, that there is a substantial danger to the plaintiff's business in selling replacement plugs. A Ford owner, asking for a Ford plug, and wanting to get the kind he had got with his car, might well be guided altogether by its general appearance. It is true that, if he observed the name, "Champion X," he would not be misled; but he might well not look at the name. Nor are the circumstances such that the color of the cartons counts. If the original plugs came in cartons, I should think that distinction enough, without more; but they do not. Therefore the buyer cannot distinguish between the defendant's cartons, and the plaintiff's he has never seen. It seems to me, therefore, that the plaintiff is entitled to some relief against such an absolute copy as is here presented.

[3, 4] In such cases the first question is always whether the points of similarity are essential features of the thing sold. When they are, the right to copy them is necessarily involved in the right to sell that particular thing; if the plaintiff is affected, it is his mischance that his manufacture has not become associated with some arbitrary and unessential feature. Yet even here it is often possible to insist upon the second comer's adding some arbitrary mark, itself not essential, by way of distinction. The case is in essence no different from those of the secondary user of descriptive or geographical names. The plaintiff in both cases finds himself in such a position that his customers have come to associate his make with some feature which in its origin did not represent him at all. It can make no difference that in cases of genuine secondary user the feature is itself a symbol, representative, but representative of something else than the plaintiff's manufacture, while in cases like this the feature was not originally a symbol at all. In each case the feature has become a symbol of the maker, and, when others use it, he runs the chance of losing his customers. There is equal reason in each case to compel the second comer to add some distinguishing mark to the feature to avoid its acquired meaning. Nor does it matter in substance whether the feature lies in the case or container or in the very thing itself. Coca Cola Co. v. Gay-Ola Co., 200 Fed. 720, 119 C. C. A. 164; Id., 211 Fed. 942, 128 C. C. A. 440; Hiram Walker & Sons v. Grubman (D. C.) 222 Fed. 478. The limitation in application must be the feasibility of a mark which shall not be too burdensome.

In cases like Enterprise Mfg. Co. v. Landers, Frary & Clark, 131 Fed. 240, 65 C. C. A. 587, Yale & Towne Mfg. Co. v. Alder, 154 Fed. 37, 83 C. C. A. 149, and Grier Bros. Co. v. Baldwin, 219 Fed. 735, 135 C. C. A. 433, there were features added by the defendant which could have no purpose, and, what is more to the point, no effect, except to mislead the buyer into supposing the goods were of the plaintiff's make. They could be subtracted from the article without affecting those features which controlled the buyer's choice. Such cases as Rushmore v. Manhattan Screw & Stamping Works, 163 Fed. 939, 90 C. C. A. 299, 19 L. R. A. (N. S.) 269, Lovell-McConnell Mfg. Co. v. American Ever-Ready Co., 195 Fed. 931, 115 C. C. A. 619, and Rushmore v. Badger Brass Mfg. Co., 198 Fed. 379, 117 C. C. A. 255, avowedly rest upon the same basis, yet the doctrine was in those cases pressed very far, since the design of a motor lamp or horn may well be a part of the reason why the buyer chooses them. To deny the second comer the right to use that design seems rather to step beyond the principle which protects only such symbols as are representative of the plaintiff's manufacture, nor does it seem an entirely adequate answer to say that the features enjoined are nonfunctional. It is only when the mechanical operativeness of the thing is certainly all that determines the buyer's choice that such a criterion is safe. Margarete Steiff, Inc., v. Bing (D. C.) 215 Fed. 204.

In the case at bar there is no danger of losing sight of the distinction suggested, if the test be applied of nonfunctional features, because a buyer will not choose a spark plug because its appearance pleases his fancy. However, I am not satisfied that any part of the defendant's plug is nonfunctional and could be changed without some sacrifice, or at least some chance of sacrifice, to its real mechanical value. The fact that in earlier plugs the shell electrode was not bent up has some force, yet the bend has some functional plausibility, and I am not prepared to take from the defendant that feature. The lengthening of the porcelain is another feature, possible perhaps, but not certainly without some question, since it adds to the plug's fragility. More may be said for lengthening the hex; but I think there are better and sufficient ways to distinguish the plugs than by imposing this requirement upon the defendant. It seems to me rather that if the defendant be required to change the color of the plug it will be a more certain means of distinction, and will avoid the need of any mechanical change in what is a quite legitimate competition. If, for example, the whole shell and bushing be nickeled, which could be done at the trifling cost of 35 cents per 1,000 and if a quarter-inch band of color be run around the top of the porcelain, which would add little or nothing more to the cost, it seems to me that not even a careless buyer would be misled. If he bought such a plug, I think he would be genuinely indifferent to its maker.

These changes impose some burden upon the defendant, yet the cost is not substantial, and the gain to the plaintiff may be real. To couple these changes with an elongation of both shell and porcelain would, it is true, add something, the appearance being thus wholly reorganized in form and color; but a buyer who was so careless as not to observe

the total change in color would not, I should suppose, be likely to attend to such changes in form. There is not, it must be remembered, any evidence, as is customary in cases of secondary user, that the buyers have in fact got used to associating the plug's structure with the plaintiff's make.

A question was raised at the trial of the kind of nickeling which might serve. It is enough to observe that the time which counts is the moment of purchase. If the plug has a different color then, it is enough, however the color changes thereafter. On this account the defendant will be free to adopt any other distinctive color than nickel on the shell and bushing nut, whether it wears off or not. If it chooses, it may dip the shells in any coloring material.

Furthermore, it must be understood that any protection to which the plaintiff is entitled depends altogether upon its monopoly of the Ford motor factory equipment. In its direct competition for the Ford business the defendant may copy the plaintiff's plugs to the minutest detail, because the Ford Motor Car Company cannot be misled as to the manufacturer with whom it deals. If the defendant or any one else by such competition can secure a substantial part of the equipment of that car, so that any given buyer may get either the plaintiff's or some one else's, it would obviously be unjust to assume that, in seeking to replace his plugs with those which he originally got, he must want the plaintiff's plugs. The decree will be held open at the foot for modification upon proof of such a change.

Courts often decline in decrees in such cases to indicate what features of the defendant's make-up need be changed; but there appears to be no necessity of throwing the parties to a proceeding in contempt, when the matter turns altogether upon the precise distinction which will in the end be accepted. It has been the custom in this district to provide more specifically the conditions upon which the defendant may compete, and I shall follow that custom in this case.

Therefore the decree will provide that the defendant will be enjoined from selling its "Mosler Superior" plug as at present organized, unless it change the color of the shell and bushing nut, and of the porcelain, so as to distinguish their appearance. I will at present go no further than to provide for such changes generally. The color of the shell and porcelain are at the defendant's option, so they be distinctive, and the porcelain be not marked in red in any way. The amount of the color on the porcelain, whether over the whole, or by a band, and, if so, the width of the band, I will also leave open. I have suggested a quarter-inch band at the top, and it rather seems to me that it should be so, but I am not ready finally to tie the defendant quite so closely as that, except that the name "Mosler" must be retained, or, in the case of plugs made for jobbers, the name of the jobber, or some trade-mark, in letters other than red, which shall be unlike "Champion X."

The decree will also provide for application at the foot in case any other maker shall secure a part of the Ford equipment business.

[5] I see no occasion for costs, and each party will bear its own disbursements. The case appears to me one of honest trade differences.

[6] I see no reason why the plaintiff should advertise its decree in any way. There is nothing unfair in the defendant's prior advertising to correct, and, when that is the case, neither side should be allowed to scare off customers by the flourish of a decree. The plaintiff will therefore refrain from any advertisement at the peril of losing its decree.

### On Motion to Settle Decree.

A hearing has been had for the settlement of the decree in these cases, in which the plaintiff objects to the limitation of the injunction in respect of my permitting the defendants to furnish the Ford Motor Company with plugs made of a color precisely like their own. They suggest that precisely similar plugs in form and finish furnished to the Ford Motor Company may become a means of confusion. The defendants thereupon accepted the suggestion of the plaintiff that the decree should include sales to the Ford Motor Company, provided that the requirement that the porcelain should be colored with a circular band be omitted. To this the plaintiff has agreed, and therefore the decree will simply require the defendants to color the shell and bushing nut with nickel or in some other appropriate way, and to retain upon the porcelain the name of the dealer or of the maker in some other color than red.