RONSON ART METAL WORKS, INC., Plaintiff, *v.* GIBSON LIGHTER MFG. CO. et al., Defendants.

Supreme Court, Special Term, New York County, November 25, 1953.

*Joseph Lorenz* for plaintiff.

*Harry J. Halperin* for defendants.

WALTER, J. Plaintiff manufactures and sells devices which by the pressure of the finger of the user cause sparks to ignite a wick, which are used for the lighting of cigars and cigarettes, and which are known as cigar and cigarette lighters; and *it*

has done so for many years. In 1952, defendants began the manufacture and sale of similar devices. Plaintiff claims that defendants are engaging in unfair competition in that they use methods which mislead the public into believing that defendants' lighters are the plaintiff's lighters, and it brings this action for an injunction, an accounting and damages.

Plaintiff was incorporated in 1928, under the name of Art Metal Works, Inc. On January 17, 1928, its founder, Louis V. Aronson, obtained U. S. Design Patent No. 74,248. On June 12, 1928, he obtained U. S. Patent No. 1,673,727 for a form of lighter having means to ignite a wick by means of a shower of sparks. The term of that patent was extended for seven years from June 12, 1945, by reissue Patent No. 19,023, issued December 12, 1933. On May 28, 1935, Aronson obtained U. S. Patent No. 2,002,845 for a more efficient and convenient form of lighter. On July 16, 1946, Frederick Kaufman, an employee of plaintiff, obtained U. S. Design Patent No. 145,217. Plaintiff manufactured its lighters under those patents.

Those patents concededly expired on the following dates: No. 74,248 on January 17, 1942; No. 2,002,845 on May 28, 1952; No. 19,023 on June 12, 1952; No. 145,217 on July 16, 1953.

As plaintiff's patents have all expired, it necessarily follows that the patents themselves give plaintiff no right to relief and that defendants are legally free to make and sell the patented article and to call the article by its generic name '' lighter '', subject only to the qualification that their right to do so must be exercised fairly and that fairness requires that defendants reasonably distinguish their products from the products of plaintiff (*Singer Mfg. Co.* v. *June Mfg. Co.*, 163 U. S. 169, 186, 187, 188, 200, 202, 204; *Kellogg Co.* v. *National Biscuit Co.*, 305 U. S. 111, 120, 121; *Westcott Chuck Co.* v. *Oneida Nat. Chuck Co.*, 199 N. Y. 247, 250; *Pocket Books* v. *Meyers*, 292 N. Y. 58, 61).

Where the form, shape and appearance of a patented article are an integral and essential part of the article as made and sold under the patent, the public, upon the expiration of the patent, has, not only the right to make the article, but, also, the right to make it in the form and shape and with the appearance of the article as made by the patentee or his assignee (*Wilcox & Gibbs Sewing Mach. Co.* v. *Kruse & Murphy Mfg. Co.*, 14 Daly 116, affd. 118 N. Y. 677; *Singer Mfg. Co.* v. *June Mfg. Co.*, 163 U. S. 169, *supra; Kellogg Co.* v. *National Biscuit Co.*, 305 U. S. 111, *supra*), but even there (i. e. even where form, shape and appearance are such an integral and essential part of the

patented article that the public, upon the expiration of the patent, has the right, not only to make the patented article, but, also, the right to make it in the form and shape and with the appearance which the manufacturer under the patent gave it) every person who undertakes, after the expiration of a patent, to make the patented article in the form and shape and with the appearance of the article as it was manufactured under the patent assumes the burden of using reasonable means to distinguish his articles from the articles manufactured by the patentee in such manner that the public will not be misled into thinking that the products of that person are products of the patentee (*Singer Mfg. Co.* v. *June Mfg. Co.*, 163 U. S. 169, 186, 187, 188, 200, 204, *supra; Kellogg Co.* v. *National Biscuit Co.*, 305 U. S. 111, 120, 121, *supra; Westcott Chuck Co.* v. *Oneida Nat. Chuck Co.*, 199 N. Y. 247, 250, *supra; Pocket Books* v. *Meyers,* 292 N. Y. 58, 61, *supra; Yale & Towne Mfg. Co.* v. *Ford,* 203 F. 707; *Eagle Pencil Co.* v. *Baehr,* 118 Misc. 571).

This case hence turns upon a single question of fact: Have defendants taken reasonable means to distinguish their lighters from plaintiff's lighters in such way that the public will not be misled into thinking that defendants' lighters are lighters made by plaintiff?

Considerable was said upon the trial about " secondary meaning ", but, as I see it, the doctrine of secondary meaning is not involved, because plaintiff's right to relief does not depend upon proof that some fanciful, arbitrary, descriptive, or geographical word, not in itself susceptible of being a technical trade-mark, has become identified in the public mind as meaning goods manufactured by plaintiff, which is what I understand is meant by secondary meaning in the law of unfair competition.

Plaintiff, of course, must prove that, in some way, by some means, the lighters it makes are identified in the public mind as lighters made by plaintiff; but if that proof be made, then plaintiff's right to relief rests upon nothing more abstruse than the simple common-law right of every merchant not to have the goods of another palmed off on the public as his goods.

Since a very early stage of its existence plaintiff has designated its lighters by the name of Ronson (a name formed by dropping the first letter " a " from the name of plaintiff's founder, Louis V. Aronson), and in 1945, plaintiff's corporate name was changed to Ronson Art Metal Works, Inc.; and since that time plaintiff, although making lighters of many different styles and models, including table lighters as well as pocket lighters, fairly may be said to have specialized very largely in

four sizes or models of pocket lighters which it designates as Standard, Whirlwind, Adonis, and Princess. Its sales of those four models in the following years were as follows:

|      | Standard  | Princess | Whirlwind | Adonis  |
| ---- | --------- | -------- | --------- | ------- |
| 1935 | 32,000    | 86,000   |           |         |
| 1936 | 49,000    | 112,000  |           |         |
| 1937 | 80,000    | 125,000  |           |         |
| 1938 | 29,000    | 62,000   |           |         |
| 1939 | 34,000    | 82,000   |           |         |
| 1940 | 92,000    | 133,000  |           |         |
| 1941 | 139,000   | 202,000  | 46,000    |         |
| 1946 | 1,667,000 | 1,000    | 310,000   | 9,000   |
| 1947 | 2,164,000 | 177,000  | 708,000   | 133,000 |
| 1948 | 1,975,000 | 548,000  | 957,000   | 551,000 |
| 1949 | 2,235,000 | 744,000  | 1,025,000 | 488,000 |
| 1950 | 1,756,000 |          | 878,000   | 459,000 |
| 1951 | 1,929,000 |          | 987,000   | 481,000 |
| 1952 | 1,154,000 |          | 663,000   | 340,000 |

In the first six months of 1953, plaintiff sold over 252,000 of its Whirlwind lighters, over 340,000 of its Standard lighters, and over 95,000 of its Adonis lighters, and the dollar volume of all its lighter sales in those six months was $5,800,000.

Plaintiff sells its lighters to wholesalers (sometimes called dealers or distributors) who sell to retailers, who in turn sell to the individual users. The retail stores which so sell to the users are about 100,000.

Plaintiff has advertised its lighters extensively in magazines and newspapers, by radio, by television, and by distributing to dealers and retailers circulars, display cards, posters, and mats and matrices which the dealers and retailers use in making up their own individual advertisements. Plaintiff's expenditures for this advertising have been in excess of $100,000 in each year since 1935, in excess of $250,000 in each year since 1945, and in excess of one million dollars in each year since 1948; and in each of the years 1949, 1950, 1951, such expenditures exceeded $2,000,000.

In all that advertising the name Ronson has been used prominently and exclusively as the name by which plaintiff's lighters have been designated. In most of it, pictures of the lighters themselves have been displayed, along with the names Standard, Whirlwind, and Adonis, and to a lesser extent Princess. In connection with the illustrations of the Whirlwind lighter, stress has been laid upon the fact that that model has

a movable windshield, which, when raised, protects the light from the wind, and which, when lowered, is out of view and out of any position which interferes with the use of the lighter or the convenient carrying of it in the pocket. The idea that that lighter can be used out-of-doors and in strong winds is further emphasized by pictures of the God of Wind with puffed cheeks vainly trying to blow out the light while the user of the lighter lights a cigarette as easily and as calmly as if there were no wind.

In most of its advertising plaintiff has also used, consistently and conspicuously, two slogans '' World's Greatest Lighter '' and '' Press — it's lit; release — it's out ''. The latter slogan was designed to and has had the effect of emphasizing the fact that, unlike some earlier models of lighters, the models now offered by plaintiff have a snuffer which closes down upon and extinguishes the light by the mere act of removing the pressure on the fingerpiece by which the snuffer has been raised and the wick ignited. That feature has been advertised as making the lighter fully automatic as distinguished from earlier semi-automatic models on which the light had to be extinguished by pressing down the snuffer as a separate operation by the user. Plaintiff has also used in its advertising the phrase '' precision built to highest jewelry standards '' and has emphasized endurance, simplicity, and efficiency, and the safety which follows from purchasing from a reliable organization.

In the retail stores which handle plaintiff's lighters the lighters, usually if not exclusively, are exhibited in showcases or on stands without any box or covering or container, and the prospective customer sees and handles the lighter itself unwrapped. Each lighter has the name Ronson impressed in some part of the metal constituting the frame, or shell, or barrel of the lighter. Because the lighter itself is pocket size, the name Ronson as so impressed upon it necessarily is small and so placed that it is not likely to be seen except by one who takes the lighter in his hand for the purpose of examining it, but to anyone who does so take the lighter in his hand (as the prospective user-purchaser usually does) the name Ronson is plainly visible. Frequently, too, the retailer will display plaintiff's lighters fastened to a display card on which the name Ronson appears with considerable prominence.

But while plaintiff's lighters have become widely and favorably known, plaintiff always has had competition. Other lighters have been and are on the market.

It thus cannot be said that the generic word lighter has come to mean, always or exclusively, a device made by plaintiff. But the name Ronson does mean, legally and in the public mind, the plaintiff, and the name Ronson lighter means, legally and in the public mind, a lighter made by plaintiff. The public is able to and does recognize plaintiff's goods as goods made by plaintiff. If that be secondary meaning, then plaintiff has proved secondary meaning.

I turn now to defendants' lighters and conduct.

First and foremost is the fact that defendants' lighters are almost exact replicas of plaintiff's lighters. Instead of any attempt to differentiate their lighters from plaintiff's lighters, defendants have almost exactly reproduced them. To all except the most meticulous examination they are the same in size, shape, form, material, and general appearance as well as in function.

If this were a case in which form, shape, and appearance were an integral and essential part of the patented article, so that defendants, as members of the public, were legally entitled, not only to make the patented article, but, also, to make it in the form and shape and with the appearance of the article made by the patentee or his assignee, as in the case of the G frame and Singer sewing machines and the pillow-shaped shredded wheat biscuit, then, of course, the almost exact copying of the form, shape, and appearance of plaintiff's lighters would be but the exercise of the defendants' legal right; but I think this is not such a case.

The devices which plaintiff manufactured under the patents were devices which served as means for lighting cigars and cigarettes, and even when confined to such of those devices as were intended to be carried in the pocket, the patented article still is a pocket lighter and not a lighter of one particular size or shape, or of one particular material or appearance. Devices which function as plaintiff's lighters function and are of such size and shape as to be conveniently carried in the pocket (or, in other words, the patented article) can be made in many different sizes and shapes and of many different materials so as to produce many different appearances; and in practically copying plaintiff's lighters defendants were not exercising their legal right to make the patented article — they were needlessly and illegally copying plaintiff's particular design, material and appearance of the patented article. Instead of using reasonable means to distinguish their lighters from plaintiff's lighters in such way that the public will not be misled into thinking that

defendants' lighters are lighters made by plaintiff, defendants, in thus in effect copying plaintiff's lighters, were intentionally inducing such confusion in the mind of the public.

The size, shape, material and appearance of plaintiff's lighters are not the essential features thereof. (See *Champion Spark Plug Co.* v. *Mosler & Co.,* 233 F. 112, 115.) Defendants, at little cost and with little inconvenience, could have made and now can make their lighters of a different material, of a different color, and with a different shape, and yet have them function equally well and be just as convenient for carrying in the pocket.

Defendants stamp or impress the name Gibson upon each of their lighters, and at first blush it might be thought that that is an infallible and adequate means of distinguishing their lighters from plaintiff's lighters and all that the law possibly can require; but by reason of the size, shape, and material of defendants' lighters the name so stamped is so small and so inconspicuous as not to be capable of notice except upon very close inspection with advance knowledge of the fact that a name will be found if actually hunted for. In addition to that, the name sometimes is stamped so imperfectly as hardly to be visible even upon close inspection, and sometimes the *son* is easier to see than the *Gib*. That may be due to defective stamping workmanship or to the use of worn or defective dies in making the stamping, but the fact is that that does occur; and the fact that the *son* is sometimes more legible than the *Gib* suggests that defendants were not entirely innocent in their choice of the name Gibson.

No one of the name of Gibson, and no one having a name anything like Gibson, is shown to have or ever to have had any connection with the manufacture or sale of defendants' lighters. Yet defendants selected as a name for their lighter, and as a name for the manufacturer thereof, a word having the same number of syllables and the same number of letters as the name Ronson, and a word the second syllable and last three letters of which are identical with the second syllable and last three letters of Ronson. The name selected thus indicates, not an attempt to distinguish source of manufacture, but an attempt to assert as the source of manufacture a name as similar to plaintiff's name as anyone short of a desperately reckless thief would dare to attempt.

Defendants pack their lighters in small boxes into which one lighter will fit conveniently, and those boxes are marked with the name Gibson in clear and legible type. Those boxes are then enclosed in a pasteboard sleeve which also is marked with the

name Gibson. Twelve of such boxes and sleeves are then packed in a larger carton upon which, also, the name Gibson appears. Furthermore, in each box containing one lighter there is enclosed a slip of paper upon which are printed directions for use, a guarantee of service, and the name and address of defendant Gibson Lighter Manufacturing Corp. All that is of little significance, however, because the lighters as exhibited in the retail stores are not in those cartons or sleeves or boxes and the prospective purchaser does not see the carton or sleeve or box or slip of paper unless or until he actually has purchased the lighter. The prospective purchaser in the retail store hence relies entirely upon the lighter itself, which, as stated, is practically identical with plaintiff's lighters in size, shape, material and appearance and the name Gibson upon which is so inconspicuous and so nearly like Ronson as frequently, at least, to be no distinction at all.

Defendants supply retailers with display cards which bear the name Gibson, and retailers sometimes display defendants' lighters upon those cards. In such retail stores as adopt that method of display, the prospective purchaser thus has the display card as a method of distinguishing defendants' lighters from plaintiff's lighters. But so far as appears, defendants do nothing to require the retailers to display defendants' lighters on display cards bearing the name Gibson. Whether or not they are so displayed depends upon the whim of the retailer. Furthermore, the photographs in evidence further show that in many instances at least retailers exhibit lighters on display cards bearing the name Ronson and on display cards bearing the name Gibson in such locations and juxtapositions that the result is confusion rather than clear distinction.

When attention is turned from defendants' lighters to the advertisements of them, the evidence of lack of reasonable measures to distinguish defendants' goods from goods of plaintiff accumulates. Defendants have either directly circulated or started on its way to the consuming public advertising matter which displays photographs or drawings of lighters incapable of being distinguished from plaintiff's lighters, which emphasizes Standard and Windproof as the names of particular models, which uses the phrase '' America's greatest lighter value '' in exactly the same position that plaintiff uses the phrase '' World's Greatest Lighter '', which in effect copies plaintiff's slogan '' Press, it's lit; Release, it's out '' by using the almost identical slogan '' 1 Snap — lite up — 2 Release, lite out '', which uses in connection with the Windproof model a

replica of plaintiff's pictures of the God of Wind with puffed cheeks vainly trying to blow out the light, and, in conjunction therewith, a reference to the windshield. To all that is added the phrase '' Never before at these prices '' with its subtle suggestion that a lighter long well known to the public is now being offered by the manufacturer of that long well-known lighter at lower prices than ever before.

Upon those facts the likelihood of deception and confusion is so great, so near to absolute certainty, that evidence of specific instances of actual deception is not necessary (*Champion Spark Plug Co.* v. *Mosler & Co.*, 233 F. 112, *supra*).

In fact, however, the evidence here shows specific instances of such deception. Defendants' lighters actually have been sent to plaintiff for service and repair; and the great drop in the volume of plaintiff's sales in 1952, coupled with defendants' boast of their sales in that year is plainly indicative of confusion.

I conclude that defendants have not taken reasonable means to distinguish their lighters from plaintiff's lighters in such way that the public will not be misled into thinking that defendants' lighters are lighters made by plaintiff; that defendants accordingly are engaging in unfair competition; and that plaintiff accordingly is entitled to enjoin a continuation thereof and to compensation for the injury which has been done to it.

In many discussions respecting the wrong of unfair competition and the wrong of patent or trade-mark infringement, the words profits and damages have been used loosely and confusingly. That is at least partly due to the fact that in different cases the courts have adopted different ways of compensating the injured party. Some times the wrongdoer is held liable for the profits he has made (*Hamilton-Brown Shoe Co.* v. *Wolf Bros.*, 240 U. S. 251, 259; *Michel Cosmetics* v. *Tsirkas*, 282 N. Y. 195, 199; *Westcott Chuck Co.* v. *Oneida Nat. Chuck Co.*, 199 N. Y. 247, 251, 252, *supra*). Sometimes he is held liable for the profits he has caused the complaining party to lose, i.e., he is required to pay the profits the complaining party would have made if there had been no wrong (see cases just cited).

I believe, however, that the fundamental requirement is that the wrongdoer must pay compensation for the wrong, and that whether that compensation is to be measured by the profits made by the wrongdoer or by the profits the wrongdoer prevented the injured party from making, or perhaps even by some other element of damage, is to be determined by the par-

ticular circumstances of each case and even may depend upon what evidence it is possible for the parties to produce.

I hence think that the proper judgment here will be one which (1) enjoins defendants from making, selling, advertising, or offering for sale any cigar or cigarette lighters without clearly and unmistakably specifying on such lighters and in such advertising that such lighters are not the product of plaintiff; (2) refers the action to a referee (not an official referee) to ascertain and report what sum is fair and just compensation for the injury plaintiff has sustained by reason of defendants' acts of unfair competition herein described, such sum to be ascertained in accordance with the principles stated in *Michel Cosmetics* v. *Tsirkas* (282 N. Y. 195, *supra*); (3) adjudges that plaintiff have judgment for such sum as shall be found to be such fair and just compensation against each defendant who has participated in such acts of unfair competition; and (4) reserves the question of the award of costs until the coming in of the referee's report.

If any party feels that any more specific adjudication is necessary at this time, their suggestions for such more specific adjudication will be considered upon the settlement of the judgment. I direct the entry of judgment accordingly.

The foregoing constitutes the decision required by the Civil Practice Act, and judgment is to be entered thereon.